FILED
2020 Sep-01  AM 11:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DELANDIS MARSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00652-LSC |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

## I.    Introduction

The plaintiff, Delandis Marsh ("Marsh"), appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for a period of disability, Supplemental Security Income ("SSI"), and Disability Insurance Benefits ("DIB"). Marsh timely pursued and exhausted his administrative remedies and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Marsh was 42 years old at the time of the Administrative Law Judge's ("ALJ's") decision and has an eleventh-grade education. (Tr. at 25, 150, 186.) His past work experience includes employment as a heavy equipment operator,

warehouse worker, yard laborer, and pipe fitter. (Tr. at 41-44, 186.) Marsh claims he became disabled on January 13, 2016, resulting from his congestive heart failure. (Tr. at 150, 185.)

The Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled and thus eligible for DIB or SSI. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The evaluator will follow the steps in order until making a finding of either disabled or not disabled; if no finding is made, the analysis will proceed to the next step. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step requires the evaluator to determine whether the plaintiff is engaged in substantial gainful activity ("SGA"). *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the plaintiff is not engaged in SGA, the evaluator moves on to the next step.

The second step requires the evaluator to consider the combined severity of the plaintiff's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 will result in a finding of not disabled. *Id.* The decision depends on the medical evidence contained in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971) (concluding that

"substantial medical evidence in the record" adequately supported the finding that plaintiff was not disabled).

Similarly, the third step requires the evaluator to consider whether the plaintiff's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the criteria of a listed impairment and the durational requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 are satisfied, the evaluator will make a finding of disabled. *Id.*

If the plaintiff's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluator must determine the plaintiff's residual functional capacity ("RFC") before proceeding to the fourth step. *See id.* §§ 404.1520(e), 416.920(e). The fourth step requires the evaluator to determine whether the plaintiff has the RFC to perform the requirements of his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the plaintiff's impairment or combination of impairments does not prevent him from performing his past relevant work, the evaluator will make a finding of not disabled. *See id.*

The fifth and final step requires the evaluator to consider the plaintiff's RFC, age, education, and work experience in order to determine whether the plaintiff can make an adjustment to other work. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the

plaintiff can perform other work, the evaluator will find him not disabled. *Id.*; *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the plaintiff cannot perform other work, the evaluator will find him disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

Applying the sequential evaluation process, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. (Tr. at 19.) The ALJ further determined that Plaintiff had not engaged in SGA since the alleged onset date of his disability, January 13, 2016. (*Id.*) According to the ALJ, Plaintiff's diabetes mellitus, morbid obesity, chronic heart failure, dilated cardiomyopathy, and osteoarthritis of the bilateral knees are considered "severe based on the requirements set forth in the regulations. (*Id.*) However, the ALJ found that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 19-20.) The ALJ did not find Plaintiff's allegations of disabling pain to be totally credible, and the ALJ determined Plaintiff's RFC to be "the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)." (Tr. at 20.)

According to the ALJ, Plaintiff "is unable to perform any of his past relevant work." (Tr. at 23.) Furthermore, the ALJ determined that Plaintiff was a "younger individual age 18-49" at 39 years old on the date of his alleged disability onset. (Tr.

at 24.) The ALJ determined that the "transferability of job skills is not material to the determination of disability." (*Id.*) The ALJ found that there are a significant number of jobs in the national economy that March was capable of performing. (*Id.*) The ALJ concluded by stating that Plaintiff "has not been under a disability, as defined in the Social Security Act," from the alleged onset date through the date of the decision." (Tr. at 24-25.)

## II.    Standard of Review

This Court assumes a narrow role when reviewing claims brought under the Social Security Act. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the commissioner, and (2) whether the correct legal standards were applied. *See Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). This Court gives deference to the factual findings of the Commissioner, provided those findings are supported by substantial evidence, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

Nonetheless, this Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir.

2004)). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Miles*, 84 F.3d at 1400 (11th Cir. 1996) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983)). Indeed, even if this Court finds that the proof preponderates against the Commissioner's decision, it must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400 (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

However, no decision is automatic, for "despite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984) (citing *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1989)).

## III.  Discussion

Marsh claims that the ALJ's decision should be reversed and remanded because the ALJ improperly applied the Eleventh Circuit's "pain standard" by failing to articulate reasons in the record that discredit his subjective pain testimony.

Marsh's subjective complaints alone are insufficient to establish a disability. *See* 20 C.F.R. §§ 404.1529(a), 416.926(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a plaintiff claims disability due to pain or other subjective symptoms. The plaintiff must show evidence of the underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. §§ 404.1529(a), (b), 416.929(a), (b); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029; *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of the plaintiff's alleged symptoms and their effect on his ability to work. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which the plaintiff's symptoms, such as pain, affect his capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a plaintiff's symptoms, (3) the plaintiff's daily

7

activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the plaintiff takes to relieve symptoms, and (8) any conflicts between a plaintiff's statements and the rest of evidence. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4); SSR 16-3p. In order to discredit the plaintiff's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210. "Although [the Eleventh Circuit] does not require an explicit finding as to credibility . . . the implication must be obvious to the reviewing court." *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d at 1562). The ALJ is not required to cite "particular phrases or formulations" in his credibility determination, but it cannot be a broad rejection that is insufficient to enable this Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.*

A credibility determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom.*, *Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). Courts in the Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). "The question is not . . . whether [the] ALJ could have

reasonably credited [Plaintiff's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Marsh stated that he stopped working primarily because of his chronic heart failure, in addition to complaints of shortness of breath and knee pain. (Tr. at 35-37, 185.) The ALJ noted that the impairments underlying Marsh's medical condition could be reasonably expected to cause his alleged symptoms and functional limitations, satisfying the first part of the pain standard. (Tr. at 23.) However, the ALJ found that Marsh's statements concerning the intensity, persistence, and limiting effects of these alleged symptoms were not entirely consistent with the medical and other evidence contained in the record. (*Id.*) The ALJ supported this conclusion by evaluating objective medical evidence, treatment history, and daily activities. (Tr. at 21-23.) Substantial evidence supports the ALJ's conclusion in this case.

First, Marsh's treatment history indicates that his conditions are not as limiting as he alleged. In June 2015, Marsh presented at the Kirklin Clinic ("Kirklin") complaining of a cough, primarily in the morning and late at night, and ankle pain. (Tr. at 319.) Dr. Stephen Bell reported that the cough was most likely caused by post nasal drip during the nighttime and that the ankle pain resulted from a prior injury which had not yet fully healed. (Tr. at 322.) However, Dr. Bell noted

that Marsh was able to bear weight on the ankle with no problem, and he encouraged him to start walking for 30-45 minutes daily, in addition to his normal work activities, in an effort to lose weight. (*Id.*) It was also noted that Marsh was a current smoker of two packs of cigarettes per day. (Tr. at 320.) On September 16, 2015, Marsh was again seen by Dr. Bell, who noted that Marsh's ankle pain had gotten worse. (Tr. at 330.) Dr. Bell also noted that Marsh's obesity was likely contributing to his pain and encouraged him to lose weight in addition to prescribing him pain medications. (Tr. at 333.)

On September 28, 2015, Marsh was seen by Dr. Michael Johnson at Kirklin for the pain in his right ankle. (Tr. at 334.) Marsh described the pain in his right ankle as an "8/10 achy pain with walking and weightbearing," noting that rest and pain medications eased the pain. (*Id.*) Dr. Johnson's examination of Marsh found full strength and painless range of motion in both of Marsh's ankles. (Tr. at 336.) Dr. Johnson diagnosed the pain as a result of posterior tibial tendonitis and prescribed physical therapy in addition to Marsh's pain medications. (Tr. at 337.)

Then, notes from physical therapist Amanda Henderson, following a physical therapy evaluation on October 1, 2015, indicated ankle pain with decreased range of motion, strength, and functional mobility. (Tr. at 340.) On January 4, 2016, Marsh reported to the emergency room at St. Vincent's East in Birmingham, complaining

of shortness of breath, a cough, and fever. (Tr. at 257.) Dr. Dennis Jones reported that Marsh had acute dyspnea and acute bronchitis. (Tr. at 260.) Marsh was discharged the same day with instructions to seek immediate treatment if his cough produced bloody thick sputum. (*Id.*)

Physical examinations by both Dr. Jones and Berlie Flournoy, a Registered Nurse ("RN"), found that Marsh had full range of motion in all extremities, with no muscle weakness on January 4, 2016. (Tr. at 258, 263.) He was also instructed to avoid smoking and advised that quitting smoking would help his lungs heal faster. (Tr. at 260.)

On January 7, 2016, Marsh returned to the St. Vincent's East emergency room, reporting shortness of breath and coughing up blood. (Tr. at 243.) A physical examination by Heather Lambert, RN, found that Marsh had full range of motion in all extremities, with no muscle weakness. (Tr. at 245.) Nurse practitioner Candace Robinson performed an examination leading to a clinical impression of acute shortness of breath, pneumonia, and heart failure with mild pulmonary edema on January 7, 2016. (Tr. at 250.) At a follow up appointment with Dr. Bell at Kirklin on January 15, 2016, Marsh reported that he was "feeling better," despite continuing to cough "yellow mucus." (Tr. at 343.) Marsh denied any shortness of breath and stated that Mucinex did provide some relief from his cough. (*Id.*)

11

On March 6, 2016, Marsh was admitted into the University of Alabama in Birmingham Hospital ("UAB"), complaining of fever, chills, nausea and vomiting, a productive cough with bloody-streaked sputum, and frequent urination. (Tr. at 299.) Marsh was admitted to the hospital to treat severe acute congestive heart failure. (Tr. at 297.) An MRI performed on March 6, 2016, by Dr. Steven Lloyd, showed that Marsh's left ventricular systolic function was severely reduced, his right ventricular systolic function was moderately reduced, and Marsh's ejection fraction was 22 percent in his left ventricle. (Tr. at 308-10.) Marsh was also administered a nuclear stress test interpreted by Dr. Jaekyeong Heo, and an echocardiogram, interpreted by Dr. PoHoey Fan. (Tr. at 310-13.) Both physicians found severely reduced left ventricular systolic function with an ejection fraction of less than 25 percent. (*Id.*) A physical examination performed by Dr. Samuel Burleson found that Marsh had full range of motion and strength throughout his musculoskeletal system on March 6, 2016. (Tr. at 301.) He was discharged on March 10, 2016, and prescribed Lasix to be taken daily. (Tr. at 317, 348.) He was additionally counseled on the importance of quitting smoking at that time. (Tr. at 307.)

At a follow up appointment at Kirklin on March 18, 2016, Marsh stated that he had felt great since being discharged from UAB and denied any shortness of breath or chest pain. (Tr. at 348.) Marsh additionally reported walking for exercise

for thirty minutes a day, three or four days a week, and Dr. Bell advised him to continue exercising in an effort to lose weight. (Tr. at 350, 352.) Marsh was at that time listed as a former smoker. (Tr. at 350.) Marsh was seen again on April 15, 2016, for a cardiology follow up with Dr. Oscar Booker at Kirklin. (Tr. at 353.) Marsh again reported that he was having no issues with shortness of breath. (*Id.*) Dr. Booker counseled Marsh to make diet and lifestyle modifications to lose weight, as well as to continue abstaining from tobacco use. (Tr. at 356.)

On June 27, 2016, Marsh visited Kirklin for a follow up of his March 2016 acute heart failure diagnosis. (Tr. at 357.) He reported that he was experiencing shortness of breath with exertion and that he slept on two pillows at night. (*Id.*) He further reported that he had been feeling well since being discharged from UAB on March 10, 2016, but that his Lasix prescription caused frequent urination. (*Id.*) Marsh stated that he was unable to continue working his construction job because of his medications and out of fear for his heart. (*Id.*) It was at this visit that Dr. Bell diagnosed Marsh with chronic heart failure; he emphasized weight loss and medication adherence to Marsh in his treatment plan. (Tr. at 361.) Dr. Bell also noted the potential need for an implantable cardioverter defibrillator (ICD) placement if his ejection fraction failed to improve significantly in the future. (*Id.*)

On October 17, 2016, Marsh visited Kirklin in response to an ongoing cough over the preceding few months. (Tr. at 366.) He did not report any shortness of breath. (*Id.*) Dr. Bell believed that the cough was likely due to ongoing sinus congestion. (Tr. at 369.) On November 30, 2016, Marsh was seen by Dr. Oscar Booker for a routine cardiology follow-up appointment. (Tr. at 371.) Marsh reported that he felt well overall and denied any edema or shortness of breath, including while lying down. (Tr. at 371.) A physical examination performed by Dr. Booker found that Marsh had normal strength and no swelling throughout his musculoskeletal system. (Tr. at 374.) The cough treated in October 2016 was listed as resolved, and Dr. Booker continued to encourage Marsh to make diet and lifestyle changes, as well as to continue abstaining from smoking. (*Id.*)

On January 18, 2017, Marsh returned to Kirklin for a checkup. (Tr. at 376.) While he did report having a cough for the prior two weeks, he denied chest pain, shortness of breath, palpitations, and leg edema. (*Id.*) Dr. Bell noted that Marsh had "done well on medical therapy," and encouraged him to be more physically active in order to strengthen his heart in response to his chronic heart failure. (Tr. at 379.) Dr. Bell attributed the cough to sinus drainage. (Tr. at 380.) Similarly, on March 20, 2017, Marsh was seen by Dr. Bell at Kirklin, complaining of sinus congestion over

the prior two weeks. (Tr. at 381.) Marsh denied shortness of breath during the day and was treated for sinusitis. (Tr. at 381, 384.)

On April 28, 2017, Marsh was admitted to UAB. (Tr. at 386.) He initially reported shortness of breath, chest pain, and increased thirst and urination over the prior two weeks. (Tr. at 388.) By this time Marsh had resumed his smoking habit and was smoking between one-half and one pack of cigarettes per day. (Tr. at 395.) He stated that he had stopped taking his Lasix because it caused him to urinate with excessive frequency. (Tr. at 388.) While Marsh reported that his shortness of breath was worse with exertion, he denied shortness of breath while laying down. (*Id.*) Marsh was discharged on April 30, 2017, after being diagnosed with new onset uncontrolled diabetes mellitus by Dr. Joshua Burkhart, which had to be treated by insulin injections and weight loss. (Tr. at 386.) Marsh was reminded of the importance of quitting smoking. (Tr. at 398.) On May 5, 2017, Marsh made a follow-up visit to Kirklin where Dr. Bell stressed the importance of weight loss through diet changes and increased exercise. (Tr. at 410.) Marsh was recorded as a "current heavy smoker." (Tr. at 407.)

On June 14, 2017, Marsh was seen by Dr. Booker at Kirklin for a cardiology follow-up and reported that he felt well and had not been experiencing any shortness of breath. (Tr. at 411.) He did, however, complain of pain in his right knee. (*Id.*) Dr.

15

Booker ordered an echocardiogram to reevaluate Marsh's ejection fraction and to determine whether an ICD should be implanted. (Tr. at 415.) Marsh met with Dr. Bell that same day, who ordered a radiology examination of Marsh's right knee. (Tr. at 420.) Dr. Bell performed a physical examination of Marsh's right knee and found full range of motion and no obvious swelling, ligamentous laxity, tenderness with palpation, or crepitus. (Tr. at 419.)  Dr. Dirk Rehder interpreted the results of the radiology exam and concluded that Marsh had moderate degenerative osteoarthrosis involving primarily the lateral and patellofemoral compartments of the right knee and moderate degenerative osteoarthrosis of the medial compartment of the left knee with mild genu varus deformity. (Tr. at 425.) Marsh continued to be listed as a current smoker at this time. (Tr. at 414.) One month later, on July 19, 2017, Marsh again presented at Kirklin with pain in his right knee, which he rated as an eight out of ten, aggravated by long periods of sitting or walking. (Tr. at 426.) Kristen Cravens, CRNP, examined Marsh and recommended physical therapy, a brace for activity use, and weight loss on July 19, 2017. (*Id.*) The echocardiogram ordered by Dr. Booker was administered on August 1, 2017, and interpreted by Dr. PoHoey Fan. (Tr. at 432.) Marsh's right ventricular systolic function was normal, and his left ventricular systolic function was moderately reduced with an ejection fraction

between 35 and 40 percent. (*Id.*) Both Marsh's right and left ventricular functions had improved since his echocardiogram on March 7, 2016. (*Id.*)

Ultimately, none of these medical providers found limitations in Marsh's ability to work beyond the RFC determined by the ALJ. In fact, Marsh was frequently encouraged by physicians to be *more* physically active than he was, as they encouraged walking and physical therapy. (Tr. at 322, 352, 356, 361, 374, 379-80, 410, 415, 420, 429.) Additionally, physical examinations performed between January 2016 and June 2017 generally found Marsh's range of motion to be fully intact, with no muscle weakness. (Tr. at 245, 258, 263, 301, 336, 374, 390, 419.) He was merely prescribed medications for his conditions. (Tr. at 244-46, 257-59, 268-70, 277-78, 289-94, 319-22, 350-52, 354-61, 405-10).

Additionally, Marsh reported only minimal limitations at home when caring for himself and his family, particularly that it took him slightly longer to dress himself than before. (Tr. at 197-202.) Moreover, Marsh had no problem with bathing, caring for his hair, shaving, feeding himself, or using the bathroom. (Tr. at 197.) In addition, Marsh stated that he could prepare his own meals, drive himself, shop in stores, watch television, and attend church. (Tr. at 198-202.)  The ALJ did not rely solely on Marsh's daily activities in determining his subjective pain complaints. *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (holding that an ALJ may consider

daily activities in assessing a Plaintiff's credibility); *see also* 20 C.F.R. §

404.1529(c)(3) (specifically listing daily activities as a factor to consider in evaluating

a claimant's credibility). The ALJ analyzed Marsh's activities as one factor along

with the objective medical evidence and his treatment to relieve his symptoms.

Further, Marsh's smoking habit weighs in favor of the ALJ's finding of "not

disabled." Social Security regulations require disability claimants to "follow

treatment prescribed by your medical source(s) if this treatment is expected to

restore your ability to work." 20 C.F.R. § 404.1530(a). When the prescribed

treatment is not followed, without a good reason, benefits will not be paid. 20 C.F.R.

§ 404.1530(b). Even when it is not shown that proper compliance would necessarily

remove the impairment, noncompliance may still be used to discredit a plaintiff's

subjective complaints and the severity of the allegedly disabling conditions. *See*

*Stultz v. Comm'r of Soc. Sec.*, 628 F. App'x 665, 669 (11th Cir. 2015); s*ee also Parker*

*v. Astrue*, No. CIV.A. 11-0683-M, 2012 WL 2931317, at *5 (S.D. Ala. July 18, 2012)

(affirming the ALJ's decision to find the plaintiff's testimony non-credible based on

his continued smoking habit despite his physicians' recommendations.); *Holley v.*

*Chater*, 931 F. Supp. 840, 847-48 (S.D. Fla. 1996) ("the continued use of cigarettes

by plaintiff suggests that his pulmonary condition not as severe [as] he alleges.").

Marsh was, on several occasions, counseled by his treating physicians to cease

smoking to improve his cough and shortness of breath conditions. (Tr. at 260, 290, 307, 398.) While there were periods that Marsh did abstain from tobacco abuse, they did not persist, and Marsh returned to the habit despite continued direction from medical providers to abstain. These decisions undermine the alleged severity of Marsh's conditions and symptoms and support the ALJ's decision to discredit Marsh's subjective testimony.

The ALJ did not merely select a few isolated elements from the record when making his credibility determination. Substantial evidence supports the ALJ's decision. The ALJ's evaluation of Marsh is supported by citation to specific evidence that articulates explicit reasons for discounting Marsh's testimony. *See Dyer*, 395 F.3d at 1212; *Wilson*, 284 F.3d at 1226.

## IV.   Conclusion

Upon review of the administrative record, and considering Marsh's arguments, this Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** on September 1, 2020.

_____
L. Scott Coogler
United States District Judge

160704